Ann Hession, as Administratrix of the Estates of James Hession and Daniel Hession, Deceaseds, Plaintiff-Appellant, v. Liberty Asphalt Products, Inc., a Corporation, and Lorton B. Coleman, Defendants-Appellees.

Gen. No. 67–121.

Second District.

March 7, 1968.

Cohn and Kier, of Chicago, for appellant.

Caldwell, Berner and Caldwell, of Woodstock, for appellees.

MR. JUSTICE MORAN delivered the opinion of the court.

This is a wrongful death action brought by the plaintiff as administratrix of the estates of her son, James Hession, and her husband Daniel Hession, who were killed in a motor vehicle accident at the intersection of Route 134 and Grub Hill Road, in Lake County, on August 17, 1965. James was driving and his father, Daniel, who owned the car, was riding as a passenger in the front seat. They were the only occupants of the car.

The case was tried before a jury, and, at the close of plaintiff's evidence, the court directed a verdict against her. Plaintiff assigns this as error, claiming that there was sufficient evidence of negligence or wilful and wanton misconduct on the part of defendants, and of due care on the part of the decedents, to require submission of the case to the jury. We disagree and for the reasons indicated below, feel that the trial court was correct in directing a verdict.

Grub Hill Road, which runs north and south, is controlled by stop signs and Route 134 is an east-west through highway, not controlled by stop signs. In this rural area there was no posted speed limit, so the stat-

utory limits of 65 miles per hour for automobiles and 50 miles per hour for trucks applied. (Ill Rev Stats 1965, c 95½, § 146(b)(1) and (c)(2).)

Just prior to the accident, the Hession auto had been traveling north on Grub Hill Road. The defendant, Lorton B. Coleman, was driving a dump truck owned by the defendant, Liberty Asphalt Products, Inc., in a westerly direction on Route 134.

The only eyewitness to the accident was defendant Coleman who was called as an adverse witness by plaintiff, pursuant to section 60 of the Civil Practice Act (Ill Rev Stats 1965, c 110, § 60). He testified that he was driving the dump truck in a westerly direction on Route 134, and, as he approached the intersection of Grub Hill Road, was traveling at a speed of 35 to 40 miles per hour. He stated that when he was about 200 feet from the intersection, he saw the Hession car, traveling north on Grub Hill Road, enter Route 134 without stopping. The car continued across Route 134, made a "U" turn north of 134, and again entered Route 134 without stopping. Coleman testified that he applied his brakes as hard as he could, just as the Hession car was entering Route 134 the second time. He stated that the truck left 30 feet of skid marks before colliding with the left side of the Hession car in the westbound lane of Route 134, at a point 27 feet west of the center line of Grub Hill Road. Both of these roads are two lanes and are approximately 22 feet wide.

At the time of the accident, the weather was clear and the roads dry. Each of the roads was substantially level and there were no obstructions to the vision of either driver as he approached the intersection.

The investigating police officer testified that he found the two vehicles locked together at the point where they came to rest, with the front end of the truck approximately 283 feet west of the center line of Grub Hill Road. He testified to having found what appeared to

him to be skid marks leading from the point of impact to the point where the vehicles came to rest, but did not state how heavy these marks were or whether they were continuous or interrupted.

Another witness called by the plaintiff was Maynard Docka, who had been driving his automobile in an easterly direction on Route 134 just before this accident. He did not notice decedents' car before the accident, according to his testimony, but he did pass the truck at a point about 150 feet east of Grub Hill Road. On cross-examination by the defendant, he stated that he estimated the speed of the truck, at that point, to have been 30 to 35 miles per hour. He was not asked about the speed of the truck on direct examination. Docka did not see the accident, but heard a crash and saw a cloud of dust when he looked back.

One of plaintiff's allegations was that the truck was traveling at an excessive speed, yet the only two witnesses who gave direct evidence on this subject, Coleman and Docka, obviously tend to establish a reasonable speed for the truck. Although Coleman testified as an adverse witness, plaintiff is bound by his testimony unless it is rebutted or contradicted by other evidence. Kapraun v. Kapraun, 12 Ill2d 348, 355, 146 NE2d 7 (1957) ; Piacentini v. Bonnefil, 69 Ill App2d 433, 447, 217 NE2d 507 (1966). Plaintiff does not contend that Docka's testimony on cross-examination exceeded the scope of the direct examination, so, again, it would appear that plaintiff's own direct evidence tends to establish a reasonable speed for the truck.

Plaintiff attempted to prove excessive speed by the testimony of an expert, Paul C. Box, a traffic engineer and accident reconstruction specialist. Mr. Box stated that, if he were given the distance the truck had skidded after impact and if he knew the "coefficient of friction" of the pavement involved, he could, from these two factors, compute the speed of the truck at the moment of im-

pact. The witness first saw the actual pavement involved in 1967, a year and a half after the accident, but did examine photographs of the scene, taken shortly after the accident, and stated that the pavement, when he saw it, appeared substantially the same as in the 1965 photographs. The court indicated that he felt this was a sufficient foundation in this particular respect, and we are not called upon to decide the propriety of that ruling. A series of questions was directed to this witness in an attempt to elicit his opinion of the "coefficient of friction" for the pavement in question. Mr. Box stated that a "typical" coefficient of friction for asphalt pavement of the type here involved would be ".5 and up," but did not indicate that the particular pavement involved would specifically be placed in this typical range, nor was the ambiguous "up" defined to indicate the highest limits of the typical range. After a careful reading of the record, we find that Mr. Box never specifically stated the coefficient of friction for the pavement involved, what the probable range for this pavement might be, nor how much variation in the computed speed would result if one coefficient rather than another were used.

On the second element necessary to Mr. Box's computations (the length of the skid) Box apparently assumed the distance skidded by the truck was established by the "skid marks," without any evidence as to whether these marks were continuous or interrupted. In this connection, we note the defendant Coleman testified that, when his vehicle came to rest, the accelerator was stuck. This testimony was uncontradicted and, if true, could certainly indicate that the distance traveled by the truck, after impact, was not necessarily the sole result of momentum generated prior to impact. The matter of the jammed accelerator was not included in the hypothetical questions put to Box by plaintiff.

Defendants made repeated objections to the questions plaintiff asked of Box, and most of them were sustained.

It appears to us that most of the rulings were correct, and, as to the remainder, we are unable to tell, because no proper offer of proof was made. We have no way of determining from this record whether Box, under any ruling from the trial court, could have given admissible testimony which would have established an excessive speed on the part of defendants. We find no question whose propriety was not at least debatable, simply because there was no evidence to establish what the coefficient of friction of this particular pavement actually was, and how far the truck actually skidded under its own momentum after impact. These are the two elements which were, according to Box, necessary to his computation. Moreover, because no proper offer of proof was made, the record does not satisfactorily establish just what speed Box would have testified to, even assuming that the length of the skid and the coefficient of friction had been proved.

■ In colloquy with the court, plaintiff's counsel stated that, if Box were permitted to testify, he would say that the speed of the truck at impact was 59 or 60 miles per hour. Counsel did not specify what premises would lead Box to this conclusion. To some extent, the requisite formality of an offer of proof will depend upon the circumstances of the particular case. Where it is obvious that the witness is competent to testify to a fact, and it is obvious what his testimony will be if he is permitted to give it, a brief statement by counsel may suffice. Schusler v. Fletcher, 74 Ill App2d 249, 253, 219 NE2d 588 (1966). In a case such as this, however, where it is by no means clear what the witness will say, or what his basis will be for saying it, the offer of proof must be considerably more detailed and specific than the statement counsel made here. Only in this way can a reviewing court know what was excluded and determine whether the exclusion was proper. We agree with the statement in plaintiff's brief that the testimony of Box

and the related objections and colloquy, are "a morass of words and confusion." This situation was not caused by the defendant or the trial court, and, on this state of this record, we can only hold that the objections to the testimony of the witness were properly sustained. Accordingly, there was no competent evidence offered or received to show excessive speed on the part of the defendants.

■ ■ Plaintiff's allegation of negligence or wilful and wanton misconduct relates to the brakes on the truck. Plaintiff's abstract contains the following sentence, purporting to be from the testimony of the defendant Coleman:

> "At the moment of impact, I had my brakes on very hard, but just as I hit the brakes, it broke a line."

On the basis of this sentence, plaintiff claims that there was evidence that the truck had defective brakes, requiring submission of the case to the jury, notwithstanding the other testimony of Coleman to the effect that the truck had good brakes. However, the actual testimony of Coleman, of which the foregoing purports to be an abstract, was as follows:

> "Q. At the moment of impact you had your brakes on?
> "A. Yes, I did.
> "Q. And you had your brakes on hard?
> "A. Yes, but just as I hit the brakes had broke a line.
> "Q. It broke a line? What do you mean?
> "A. Part of the car cut the brake line on the truck."

An abstract should correctly and fairly give the actual substance of the testimony. There would seem to be no excuse for the inaccuracy which has occurred here, especially when we are dealing with only a few lines of

testimony and the appellant seeks a reversal based upon that testimony. Defendant correctly argues that the actual testimony of Coleman indicates merely that the brake line was broken in the collision with the car, not prior to the impact with the car. Therefore, there was no evidence to support the allegation that a defect in the brakes was a proximate cause of the collision.

■ ■ We conclude that the trial court correctly determined that there was insufficient evidence to justify submission of the negligence issue to the jury. Still less was there any evidence of wilful and wanton misconduct on the part of defendants.

Neither do we believe that plaintiff sustained her burden of proving that the decedents were free of contributory negligence. Had we disagreed with the trial court about the evidence as to defendants' conduct, we would still affirm because of the contributory negligence issue.

■ While plaintiff testified to habits of due care on the part of the decedents, there is no evidence that they used any care at the time in question. On the contrary, all of the evidence indicates that they used no care for their own safety. Grub Hill Road, being controlled by stop signs, required James Hession to yield the right of way to any vehicle on Route 134 which was approaching so closely as to constitute an immediate hazard. (Ill Rev Stats 1965, c 95½, § 167(b).) The only direct evidence as to what he did under these circumstances indicates that he ran a stop sign on the south side of Route 134, crossed 134, made a "U" turn, ran another stop sign, and drove the vehicle directly into the path of a truck which was in such proximity that a collision occurred. There was no obstruction to his vision and, had he looked before he entered Route 134 from the north, he could not possibly have avoided seeing the truck. Thus, the conclusion is inescapable that he either did not look or, having looked and seen the truck, de-

73

cided to cross the intersection anyway. Under these circumstances, James Hession was guilty of contributory negligence as a matter of law. Stop signs are erected for the obvious purpose of requiring motorists to yield to vehicles on through highways. If the motorist on the through highway had to travel at such a speed that he could stop his car in time to avoid collisions with vehicles which ignore stop signs on intersecting roads, the purpose of having a through highway in the first place would be entirely thwarted. The driver who has the stop sign cannot assume the car on the through highway will stop. It is the other way around. We agree with the language from a federal decision recently quoted with approval by the court in Lamberes v. Northern Cartage Co., 86 Ill App2d 311, 314, 229 NE2d 901 (1967), a case which involved the directional right of way at an unmarked intersection, a situation not essentially different from the one at bar:

> ". . . Obviously, two cars or other objects cannot occupy an intersection space at the same time and when both are approaching one or the other must yield or a collision will inevitably result. The law of Illinois has placed the duty of yielding upon the one approaching from the left, and a person who fails to recognize such duty without an excuse or reason, . . . should not be permitted to recover from a person approaching from the right who is entitled to assume that the right of way is his. Any other view would magnify the hazard which lurks at the point of intersecting highways."

As regards Daniel Hession, the passenger, we believe the evidence is insufficient to establish that he was in the exercise of ordinary care for his own safety, even though he was not driving. Daniel, who was 48 years old, owner of the car and father of James (who was 17 years old and driving on a "learner's permit")

had a right to control the operation of the car and a duty to supervise its operation by James. Simaitis v. Thrash, 25 Ill App2d 340, 351–352, 166 NE2d 306 (1960). See also, Illinois Motor Vehicle Law, 1957 (Ill Rev Stats 1965, c 95½, § 6–105(a)). Any conclusion that Daniel was exercising due care for his own safety would have to be based on speculation. Furthermore, aside from the question of Daniel's own lack of care, we believe that the negligence of James was imputable to Daniel under the circumstances shown by the uncontradicted evidence. Lilegdon v. Hanuska, 85 Ill App2d 262, 269, 229 NE2d 314 (1967) ; Simaitis v. Thrash, supra.

Plaintiff's final assignment of error is that the court improperly allowed the police officer to testify, on cross-examination by defendant, that he found one open beer can and one unopened beer can in the Hession car. Inasmuch as the case was taken from the jury, and properly so, the admission of this evidence, whether proper or not, did not prejudice the plaintiff. Accordingly, we have no occasion to rule on its admissibility.

For the foregoing reasons, the judgment of the lower court is affirmed.

Affirmed.

ABRAHAMSON, P. J. and DAVIS, J., concur.