LEROY HALL, Plaintiff-Appellant, *v.* BAUM CORPORATION, d/b/a WASH-
INGTON HOTEL, Defendant-Appellee.

(No. 55420;

First District (3rd Division)—June 7, 1973.

A. J. Horwitz and Dario A. Garibaldi, both of Horwitz, Anesi and Ozmon, of Chicago, for appellant.

No appearance for appellee.

Mr. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court:

The plaintiff, Leroy Hall, sued the defendant, the Baum Corporation, owner and operator of the Washington Hotel, for personal injuries received when he was an invitee of the hotel. A jury returned a verdict for the defendant and judgment was entered in accordance with the verdict. In this appeal Hall seeks a new trial because of alleged prejudicial errors, the principal ones being that the defendant impeached and improperly cross-examined its own witnesses and caused portions of a police report to be brought to the attention of the jury. Other errors relate to evidence, rulings of the trial court and instructions.

The defendant has not contested the appeal. If an appeal is perfected and the appellee does not file an answering brief, a court of review may reverse the judgment of the trial court without considering the merits of the appeal. (*Ridge Manor Convalescent Home v. City of Chicago* (1972), 4 Ill.App.3d 1077, 283 N.E.2d 272; *Perez v. Janota* (1969), 107 Ill.App.2d 90, 246 N.E.2d 42. However, it is this court's practice to examine the record to determine whether an injustice would be done an appellee by a summary reversal. (*Jordan/Tamraz/Caruso/Advertising, Inc., v. Parker Career Center* (1973), 10 Ill.App.3d 247, 294 N.E.2d 59; *Metcoff v. Metcoff* (1972), 4 Ill.App.3d 160, 280 N.E.2d 572.) After studying the record and the appellant's briefs we are of the opinion that he is entitled to reversal. Rather than reversing summarily, however, we will state the reasons for our decision.

Hall, an unemployed dockworker from Joliet, checked into the Washington Hotel in downtown Chicago about 1:00 A.M. on a humid April morning in 1964. He was assigned a room on the fifth floor. He testified that he had one or two cans of beer in the room and then, 45 minutes

later, desired some fresh air. He was directed by an elevator operator to an open fire escape door on the eleventh floor. The fire escape consisted of stairs descending along the outside wall. On the eleventh floor there was a grated platform with a railing that had three approximately equidistant horizontal bars with vertical supports. The lowest bar on the railing opposite the doorway was defective in that it was bent downward about four inches at its lowest point. As Hall stood on the fire escape smoking a cigarette, with his right foot on the lowest bar to the right of the defect and his left foot on the platform, the door (which subsequent testimony indicated had been held open by a wire coat hanger) blew shut; the door struck him, he lost his balance and fell through the railing. He managed to seize the edge of the platform and screamed for help as he held on. He tried to pull himself back up, could not make it, lost his grip and plunged downward eleven floors.

Two police officers found Hall about 3:30 A.M., severely injured but still alive, on the trunk of an automobile directly below the fire escape. A supervising sergeant arrived and Hall was taken to Cook County Hospital. The sergeant summoned an evidence technician to the scene and called in two detectives to investigate the occurrence.

The detectives were Roger Niehoff and William Havansek. They saw Hall at the hospital and spoke to him. He was able to tell them that he went to the eleventh floor to get some air and was alone at the time he fell. The detectives then went to the Washington Hotel and proceeded with their investigation. They noticed that the bottom rung of the fire escape railing was bent and that it had a heel mark on it. Officer Stanky, the evidence technician, took photographs of the fire escape and fingerprints and scrapings of the railing. Havansek prepared a report of the investigation. The second paragraph of the report said there were "heel marks on the second rail, which later proved to be the heel marks from the victim's shoes."

At issue in the case were the reasons for Hall's fall and the way he fell; whether the closing door had forced him through the railing, whether he had climbed on the railing and lost his balance or whether he had attempted suicide. It was important to the defendant to show that his fall was either deliberate or the result of his negligence. Proof that his heel prints were found on the second bar of the railing would have been of immeasurable value in establishing both defenses. In an effort to bring the second paragraph of the report to the jury's attention, Niehoff and Havansek were called as defense witnesses. Niehoff, the first to testify, said that he saw that the first rung was bent but did not notice anything unusual about the second one. Although there was no showing

that the witness' memory was faulty or that he had exhausted it, the defendant's attorney asked him to look at the police report to refresh his recollection as to whether other rungs were examined. Niehoff looked at the report, said it refreshed his recollection but again said that he did not notice anything unusual about the second rung. The same procedure was repeated and repeated. The defendant's attorney showed the report to Niehoff five times and asked him if it refreshed his recollection—once he said "to awaken your conscience"—and five times Niehoff replied that he saw nothing on the second rung. In seeming desperation the attorney tried to bring out the content of the report. He asked Niehoff, "can you tell us what's contained in the second paragraph of that recording?" and again, "Didn't you cause to be recorded there, officer, the statement —?" An objection to the first question was sustained and an objection, also sustained, interrupted the second. On the third attempt the attorney was more successful. He was permitted, over objection, to ask, "\* \* \* did you ever record or say anywhere that you saw heel marks on the second rail?" Niehoff replied, "Not to my knowledge." The attorney then inquired: "Showing you [the report], I ask you the question again." Niehoff responded, "This was not my recording, counsel."

Havansek, who had drafted the report, was then called by the defendant. He was asked what he had noticed about the railing and he said that one rung was bent and a heel mark was on it. He, too, was asked five or six times if he noticed anything unusual about the other rungs and he was given the report to refresh his recollection—again without proof that his memory was exhausted. He replied that all the rungs had been examined but he remembered nothing unusual about any rung except that a heel mark was on the one that was bent. Havansek was asked, "How about the second rung?" An objection was overruled and he answered, "According to the report, it says the second railing had a heel mark on it." The defendant's attorney inquired, "It said 'heel marks,' didn't it?" An objection to the attorney's reading from the report was overruled, but an objection for the same reason to the follow-up question, "Did you therein record that there were heel marks —," was sustained. The attorney then asked:

> "Officer, didn't you record that statement 'And heel marks on the second rail, which later proved to be heel marks from the victim's shoes'?"

The court instructed the jury to "wholly and totally" disregard the question. The court permitted, however, the attorney to ask:

> "Did you record, Officer, that you found heel marks on the second railing?"

To which the witness replied, "Yes, sir."

The court-enforced distinction between the questions resulted from revelations which came to light outside the presence of the jury. It was the evidence technician who had determined that the heel prints were made by Hall's shoes. Havansek merely recorded what the technician told him. The report, although composed and typed by Havansek, did not state that he himself had observed heel marks on the second rung. The testimony of Niehoff and Havansek was consistent throughout their examination. They said that they themselves had seen nothing unusual about the rungs except the lowest one; as far as they were concerned the reference in the report to the second rung was a mistake; they did not know of their own knowledge whether the heel mark they had seen corresponded with the heels of Hall's shoes for it was the technician who made the comparison. Both witnesses said the report refreshed their memories but were steadfast in saying that it did not alter their recollection of what their own investigation disclosed.

Undoubtedly, the defendant's attorney was disappointed in their testimony. But his frustration was caused in part by his calling them as witnesses without knowing what their testimony would be. He did not take depositions from them nor from the technician and did not summon the technician as a witness. He had a copy of the police report and he relied on it. Moreover, the report itself was confusing. It was a compilation of four individual reports: one by the police officers who first found Hall on the parked auto; the technician's report, which detailed the procedures he utilized; Niehoff's and Havansek's own closing report and a supplemental report prepared by them. The supplemental report, which was used in examining the witnesses, was basically a two-page narrative of all the areas of inquiry and a synopsis of the evidence uncovered by all the police officers involved in the case. With minor exceptions the report did not differentiate between the second-hand knowledge Niehoff and Havansek obtained and what they observed themselves.

When the defendant did not receive the evidence it expected from Niehoff and Havansek it attempted to impeach them by the supplemental report. Throughout their direct examination the defendant sought to divulge the contents of the report. By persistence and repetition it finally succeeded in revealing to the jury not only a part of the inadmissible report but a part containing hearsay information. The inadmissible disclosure bolstered the defendant's case but seriously prejudiced the plaintiff's. The prejudice was accentuated by the defendant's opening statement that the evidence would show that heel marks from Hall's shoes were on the second rung of the railing.

■■ The general rule is that a party who calls a witness to testify cannot impeach his testimony. However, there are exceptions to the rule. If a witness unexpectedly gives testimony against the party calling him, that party may examine him to call his attention to former specific inconsistent statements. (*People v. Wesley* (1959), 18 Ill.2d 138, 163 N.E.2d 500.) If the trial court determines that a witness is hostile or unwilling he may be cross-examined by the party calling him. An occurrence witness may be impeached by proof of prior inconsistent statements if the party calling him shows that he called the witness in good faith and is surprised by his testimony. Ill. Rev. Stat. 1969, ch. 110A, par. 238.

■■ The testimony in this case does not come within these exceptions. If the defendant was initially taken aback by Niehoff's testimony it was not by Havansek's, who testified after Niehoff. Neither witness was hostile or unwilling to testify. Neither was reticent, deceptive or evasive. Their only testimonial reluctance was their unwillingness to say what the defendant wanted them to. Furthermore, there was no judicial determination that they were either hostile or unwilling witnesses and they were not occurrence witnesses. An occurrence witness has personal knowledge of an event from being present when it takes place, such as a witness who observes an accident in which a personal injury was sustained. (Ballentine's Law Dictionary, 1969, 3d ed., p. 880.) Both Niehoff and Havansek arrived at the hotel after Hall had been taken to the hospital. They interrogated him there and then returned to the Washington Hotel. They were post-occurrence witnesses; they testified to their interview with Hall and to the condition of the premises after the event which formed the basis for the cause of action.

■■■ Even if the court had found that the two detectives were hostile and had granted the defendant the right to cross-examine them, the defendant could only have shown that Havansek's report contained a statement at odds with his testimony. It had no right to prove anything beyond that. Police accident reports are inadmissible in evidence in whole or in part. (Ill. Rev. Stat. 1969, ch. 110A, par. 236.) They may be used for the limited purpose of impeachment as to inconsistent statements (*Black v. DeWitt* (1965), 55 Ill.App.2d 220, 204 N.E.2d 820) or to refresh a witness' recollection (*Tuskey v. Callos* (1969), 112 Ill.App.2d 213, 250 N.E.2d 524) but they cannot be used, as the defendant did, to divulge substantive evidence to the jury. *Wolf v. City of Chicago* (1966), 78 Ill.App.2d 337, 223 N.E.2d 231.

The report was used not to refresh faulty memories but to impeach the defendant's own witnesses. The repeated references to its contents

and the readings from it not only served as attempted impeachment but as a substitute for competent evidence. The effect of the improper impeachment and references to the contents of the report was so prejudicial that it was not remedied by the diligent efforts and limiting instruction of the court.

The cause is reversed and remanded. In view of this result it is unnecessary to consider the other claims of error.

Reversed and remanded.

McNAMARA and McGLOON, JJ., concur.