CAROL RANKO YAMADA et al., Plaintiffs-Appellants, v. HILTON HOTEL CORPORATION, Defendant-Appellee.

First District (3rd Division)    No. 76-249

Opinion filed December 21, 1977.—Modified on denial of rehearing May 31, 1978.

Perry M. Berke, of Baskin, Server & Berke, of Chicago, for appellants.

John T. Burke, of Chicago (Edward J. Egan and Robert Guritz, of counsel), for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

The plaintiffs, Carol Ranko Yamada and Mabel Okubo, administrator of the estate of Evelyn Okubo, filed suit to recover for injuries sustained by Carol and for the death of Evelyn resulting from slashings inflicted by an assailant while the women were staying at the Palmer House, a hotel owned and operated by the defendant, Hilton Hotel Corporation. A jury returned general verdicts in favor of the defendant, and the circuit court of Cook County entered judgment on the verdicts. Plaintiffs appeal.

Count I of plaintiffs' second amended complaint, upon which the suit was tried, alleged that it was the duty of defendant to exercise a high degree of care for plaintiffs' safety. It further charged that this duty was breached by defendant's failure to equip its rooms with adequate security devices and its failure to maintain an adequate system of surveillance throughout the common areas of the hotel. Plaintiffs alleged that either or both of these negligent omissions constituted the proximate cause of their injuries. Count II, charging defendant with a breach of express and implied warranties relating to security, was withdrawn by the plaintiffs shortly before the case was submitted to the jury.

In July 1970, Carol and Evelyn came to Chicago as representatives of the Stockton, California, chapter of the Japanese American Citizens League (hereinafter the "JACL") to attend a JACL convention at the Palmer House. Carol, Evelyn and a third JACL member, Patti Iwataki, stayed together in Room 725.

On the day of the occurrence, July 16, Carol gave a 4½ hour presentation to the convention. It dealt, in part, with the bombings of Hiroshima and Nagasaki. That evening Evelyn attended a convention dinner at the Hilton Hotel. She returned to the Palmer House at approximately 9:30 p.m. and went to Room 862. Carol and Patti were there visiting with some friends. Evelyn stayed for a half hour and returned to their room. About 30 minutes later, Carol went to the room to get a radio and to see if Evelyn would rejoin them. Carol had a key to the room, but could not remember whether she had asked Patti for the key. On one prior occasion, Patti had chastised Carol for leaving her key in the door to their room.

Carol knocked on the door of their room but received no answer. She opened the door with her key, entered the room, took the key out of the door and closed it. As she entered the vestibule of the room she saw Evelyn's naked body on the floor. Evelyn was on her back, her hands

were tied behind her and she had a pillow over her head. Carol stopped and a man came out from behind the wall on her left side and grabbed her. She described him as tall, black, naked and having a long, uneven messy afro hair style. He forced Carol to lie down and tied her hands behind her back. He cut off her clothes and covered her head with a sheet. He also tied her feet. He turned her on her back. Carol heard a noise and the man arose and began moving around the room. Carol heard him take Evelyn into the bathroom and could hear Evelyn struggling as she was put into the bathtub. Evelyn screamed once and then it was silent. The man dragged Carol to the vestibule opposite the bathroom door. When he came out of the bathroom, Carol heard the rustling of clothes as if the man was dressing. He came over to her, lifted the sheet, and cut her throat. She saw him briefly and then closed her eyes pretending to be dead. She believed he was wearing blue jeans and a dark colored shirt.

After the man left, Carol dragged herself or hopped over to the door. She had managed to partially untie her hands. She locked the door by turning something other than the knob. Defendant's security officer and office manager testified that when the door is closed, it is locked and the only way to double lock it is to use the key on the inside. A photograph taken of the room after the occurrence shows that there was no key in the door and nothing other than the knob to turn.

Carol tried to untie her legs but was unable to do so. She went to the telephone but could not speak to the operator. The operator could not tell from which room the call was coming. Carol began writing notes. Among them were the following: "he's black w/ a natural," "it looks gory but there's no pain," and "don't blame him it is not his fault." She testified that she wrote the notes because she thought she was dying and did not want her family to think her death had been painful.

Carol then dragged herself to the door and banged on the wall with a shoe. When no one came, she went to the bathroom to find something to cut the cords binding her ankles. She was in the bathroom holding a razorblade when Patti entered the room. Upon seeing Carol with the blade in her hand and blood streaming down her neck, Patti said, "Why did you do it?" Carol pulled her over to the notes to show her what she had written. Help arrived and Carol was taken to the hospital. The assailant did not rape Carol or Evelyn.

The Palmer House has 24 floors above street level and 2,144 guest rooms. There is an arcade at street level which can be reached through any of three public entrances. Automatically operated elevators at the street level go to all guest room floors. These elevators also go down to a lower arcade. The stores in the arcade level close at 10 p.m., but public access to the arcade continues through the street level entrances.

Frank Lopez, an expert witness for plaintiffs, became chief of security

at the Palmer House in July 1970 and left its employ in May 1971. The Palmer House security force consisted of five men in each of three daily shifts. Three of the five men were given stationary positions, none of which were located at the street level entrances. The other two men patrolled all floors of the hotel. During the period between January 1 and July 16, 1970, there were several incidents of illegal entries of guest rooms by "undesirables." Lopez was of the opinion that a black man in jeans and with a messy afro would be considered a potential undesirable and would be challenged if observed by a security officer. Leonard Mackiewicz, a former security officer for the Palmer House, testified that the term "undesirable" would include any person causing a ' disturbance, prostitutes, and people who were not clothed properly. The term also would include anyone who looked suspicious to the witness.

Lopez recommended to management that additional men and an augmented security program were necessary, given the size of the Palmer House and the number of illegal entries in the recent past. He believed that it would have taken 15 to 20 men per shift to provide adequate security for hotel guests. Prior to the present occurrence, Lopez recommended that the security staff be increased to eight men per shift. He asked for a smaller increase because he felt that management would be more receptive to the proposal. As of July 16, 1970, his request had not been granted.

We shall first consider defendant's contention that, regardless of any error committed in the trial court, the judgment must be affirmed because plaintiffs failed to make out a sufficient case to warrant submission of the issue of defendant's liability to the jury. In support thereof, defendant argues that plaintiffs presented no competent evidence which would support a reasonable inference that the injuries were in any way proximately caused by defendant's negligence. Defendant contends that any verdict finding it liable would be based on speculation and conjecture.

■■ ■ While we agree with defendant that there are other possible theories as to how plaintiffs' assailant gained access to their room, some unrelated to any negligence on defendant's part, we do not believe the trial court properly could have granted defendant's motion for a directed verdict. When received in the light most favorable to plaintiffs, *American National Bank & Trust Co. v. Peoples Gas Light & Coke Co.* (1963), 42 Ill. App. 2d 163, 191 N.E.2d 628, the evidence presented at trial, including the testimony of Frank Lopez as to the inadequacy of the security and that of Carol Yamada describing the assailant, presented a question of fact for the jury. Particularly in such cases where the presentation of direct evidence is impossible, courts have been reluctant to conclude that a verdict based upon circumstantial evidence cannot be upheld. This is so

even though a contrary verdict could have been reached based upon the same circumstantial evidence. (See *Pearson v. Ford Motor Co.* (1975), 32 Ill. App. 3d 188, 336 N.E.2d 528; *Justice v. Justice* (1969), 114 Ill. App. 2d 254, 252 N.E.2d 493; *Olsen v. Pigott* (1963), 39 Ill. App. 2d 191, 188 N.E.2d 361.) Only when there is a complete absence of probative facts supporting an inference can it be said that such inference is clearly unreasonable. (*Justice v. Justice.*) A verdict for plaintiffs could be upheld.

Plaintiffs contend that several erroneous evidentiary rulings by the trial court, solely or cumulatively, constituted prejudicial error against them and mandate a new trial. Plaintiffs maintain that defense counsel was in error in examining Patti as a hostile witness at the time of her deposition. After a discovery deposition her evidence deposition was taken in California some time prior to trial. The error was compounded, plaintiffs urge, when defense counsel was permitted at trial, over objection, to present the contents of Patti's evidence deposition to the jury.

As part of the convention activities, some members of the JACL visited informally with representatives of local organizations including the Black Panthers, to discuss their community projects. Patti printed an article in the *Pacific Citizen* that Evelyn was among those who visited the Black Panther Center. At the evidence deposition, Patti testified that she could not remember whether or not Evelyn had gone with them on that occasion. Defense counsel read her the text of the article. The witness still stated that she could not recall who visited the center. Defense counsel also commented during closing argument how he had impeached Patti by using her article. Plaintiffs maintain that they were severely prejudiced in that this evidence was the only manner in which defendant was able to bolster the theory that the assailant was not an intruder but someone Evelyn had invited back to the room. (A cleanup man testified that five days after the incident he found a Black Panther newspaper in Room 725. Photographs taken of the room right after the occurrence did not reveal the presence of any Black Panther literature in the area where the newspaper was found.)

■■ In response, defendant argues that plaintiffs' counsel waived any error in the admission of this testimony by stating in his closing argument "* * * we know that Patti and Evelyn, a few days before, had visited the Black Panther Center * * *. That is not important." We do not agree with defendant's response. The comment by plaintiff's counsel can only be construed as a legitimate attempt to avoid what he perceived to be the damaging effects of this evidence. Counsel's acknowledgment that the women had visited the center in an effort to diminish the importance of this evidence cannot be construed as an admission of the truthfulness of the item in the *Pacific Citizen* article or operate as a waiver of error. (See *Sabo v. T. W. Moore Feed & Grain Co.* (1968), 97 Ill. App. 2d 7, 239

N.E.2d 459; *Deel v. United States Steel Corp.* (1969), 105 Ill. App. 2d 170, 245 N.E.2d 109.) To hold that counsel's statement in closing argument constituted a waiver of any objection to this evidence would deprive him of any effective means of countering evidence he believes to be erroneously admitted and prejudicial to his case. The authorities cited by defendant, *Flewellen v. Atkins* (1968), 99 Ill. App. 2d 409, 241 N.E.2d 667; *Drell v. American National Bank & Trust Co.* (1965), 57 Ill. App. 2d 129, 207 N.E.2d 101; *Darling v. Charleston Community Memorial Hospital* (1964), 50 Ill. App. 2d 253, 200 N.E.2d 149, *aff'd* (1966), 33 Ill. 2d 326, 211 N.E.2d 253, are distinguishable in that they involve statements by counsel which admit a contested fact or issue which is central to the disposition of the case.

■■ Defendant also responds by urging that plaintiffs' counsel in California failed to interpose any objection to the questioning of Patti concerning the newspaper article during the taking of the deposition. When defense counsel proposed to proceed with the witness as hostile, the following objection was made: "There is still no showing of any adversity or hostility and we will object to any questions other than in the form of questions as they—as his own witness in a direct examination under the Rules of Evidence." Thus, it is clear that plaintiffs preserved their objection to the cross-examination of the witness as hostile as required by Supreme Court Rule 211(c)(2). (Ill. Rev. Stat. 1975, ch. 110A, par. 211(c)(2).) It was not necessary for plaintiffs to object specifically to each question.

■■ Defendant further maintains that when Patti continued to claim a lapse of memory regarding the news article, it was proper to impeach her as an occurrence witness under Supreme Court Rule 238. (Ill. Rev. Stat. 1975, ch. 110A, par. 238.) First, it is doubtful whether Patti properly can be considered as an occurrence witness. The substance of her testimony relating to the incident consisted of her reaction upon seeing Carol in the bathroom with a razorblade in her hand and her subsequent efforts to get help. The occurrence which was the subject matter of the suit was the actual attack on Carol and Evelyn. We think Patti can be classified as a post-occurrence witness. See *Hall v. Baum Corp.* (1973), 12 Ill. App. 3d 755, 299 N.E.2d 156.

Even assuming that she could be considered an occurrence witness, Rule 238 requires that before such a witness may be impeached by prior inconsistent statements the party calling the witness must be surprised by the testimony. Defendant advances the argument that when Patti was unable to recall the JACL members' visit to the Black Panther Center, he was entitled to impeach her by using the contents of the article she had submitted to the newspaper. The element of surprise is satisfied,

defendant contends, because defendant expected her deposition testimony to conform to what she had written in the article.

■■ Defendant's argument fails because of the purpose for which this testimony was used at trial. The substance of Patti's evidence deposition testimony was used, not to impeach, but rather substantively to bolster defendant's theory that plaintiffs' assailant was not an intruder. "The purpose of 'impeachment' is to destroy credibility rather than to prove the truth of the matters stated in the impeaching testimony. What a nonparty witness said outside of court is pure hearsay and is incompetent as evidence." (*Kubisz v. Johnson* (1975), 29 Ill. App. 3d 381, 383-84, 329 N.E.2d 815.) From the record, it is obvious that defendant introduced and argued the text of the article written by Patti as substantive evidence that Evelyn did, in fact, visit the Black Panther Center in Chicago. As such, this evidence was improper, and should not have been admitted. *People v. Gant* (1974), 58 Ill. 2d 178, 317 N.E.2d 564; *Walsh v. Dream Builders, Inc.* (1970), 129 Ill. App. 2d 280, 264 N.E.2d 247.

■■ Defendant finally argues that the trial court did not abuse its discretion in admitting Patti's evidence deposition testimony as that of a hostile witness because her alignment with and sympathy for plaintiffs justified her being cross-examined. The Committee Comments to Supreme Court Rule 238 state that the rule authorizes cross-examination of any witness who proves hostile or unwilling. From a reading of the text of Patti's deposition, which was all that was before the trial court, we find nothing to indicate any hostility or unwillingness on her part. Defense counsel proceeded to question her as a hostile witness after asking and receiving an affirmative reply to questions as to whether she had spoken to Carol, Evelyn's mother, and to plaintiffs' attorney after receiving a subpoena to testify. The fact that Patti may have been unsympathetic to defendant's case is, in and of itself, insufficient to invoke the provisions of Rule 238. (*Quagliano v. Johnson* (1968), 100 Ill. App. 2d 444, 241 N.E.2d 187.) Her only testimonial reluctance was her inability to recall whether or not Evelyn had been among the JACL members who visited the Black Panther Center. This is hardly the proof of unwillingness or hostility required. See *Hall v. Baum Corp.* (1973), 12 Ill. App. 3d 755, 299 N.E.2d 156.

■ No theory advanced by the defendant justified the admission of Patti's deposition into evidence. Moreover, we find the error was prejudicial because principally through the introduction of this evidence was defendant able to argue that plaintiffs' assailant was not an intruder but a guest.

Plaintiffs' next assignment of error is that the trial court erred in granting defendant's motion in limine excluding certain testimony of Frank Lopez,

chief of security at the Palmer House at the time of the occurrence. Lopez was not permitted to testify that on the evening in question there was no night chain on the door of Room 725, that he had recommended the installation of night chains on all guest room doors, and that night chains had been installed within months after the incident. He also was not permitted to testify that he had recommended to management that, based upon a study he had made at other major downtown hotels, he needed additional men and closed circuit television surveillance to provide adequate security.

■■ The court properly refused to allow Lopez to give testimony of the post-occurrence installation of night chains. Evidence of subsequent repairs or improvements is inadmissible to show defendant's negligence. See *Offutt v. Pennoyer Merchants Transfer Co.* (1976), 36 Ill. App. 3d 194, 343 N.E.2d 665.

With regard to the recommendations made by Lopez to the hotel, defendant counters that plaintiffs' offer of proof was defective and, therefore, this evidence should not be considered. Defendant argues that plaintiffs' counsel was required to state when, where, and to whom these recommendations were made. The purpose of an offer of proof is to indicate to the trial court, opposing counsel, and to the reviewing court the substance of the testimony expected to be offered. (*Moren v. Samuel M. Langston Co.* (1968), 96 Ill. App. 2d 133, 237 N.E.2d 759.)To a certain extent, the requisite formality of an offer of proof will vary according to the facts and circumstances of each case. (*Hession v. Liberty Asphalt Products, Inc.* (1968), 93 Ill. App. 2d 65, 235 N.E.2d 17.) Where, as here, the trial court indicated that counsel's informal offer of proof sufficiently indicated what the substance of the witness' testimony would be, it was not necessary for counsel to go into further detail.

■■ The trial court rejected plaintiffs' offer of proof concerning the recommendations made by Lopez because it believed it was irrelevant to the issues of the case. We do not agree. It is difficult to perceive a difference in kind between Lopez' recommendation that the security staff be increased, which testimony was admitted at trial, and his recommendations relating to night chains and the installation of electronic surveillance. Lopez stated that, in the area of hotel security, there are no industry standards per se because the circumstances of each hotel demand a particularized security program. We believe, however, that his study of other major downtown hotels qualified him to testify as to what he considered would be an adequate security system for the Palmer House. Defendant's motion in limine to exclude the substance of Lopez' recommendations to Palmer House management should have been denied.

■■ Plaintiff also contends that the trial court erred in permitting

defense counsel to read from an article written by Carol after the completion of a seminar given by the University of California which met inside the Soledad Prison. Part of that article described her youth, stating:

"Many of my roots are imbedded in Chinatown, San Francisco, luaus, dances, a neighborhood of death, TB, Reds, undercover cops, and trips. Lots of trips from the red hair and straight black security; cruising and visiting friends in juvenile homes between the ages of 12 to 15; to a white social trip to a white hippy trip; and lastly, and permanently no longer a trip, being part of the Asian movement."

The article also described the Buddhist practices of the Yamada family. Defendant maintains this evidence was relevant to rebut the implication in plaintiff's testimony that she had led a relatively tranquil life prior to the present occurrence. We find no such implication in the record. Moreover, while traumatic events after the occurrence may have some demonstrable relevance to plaintiff's measure of damages as we will discuss later, Carol's life before this incident has no bearing on that issue or any other issue in the case. The article should not have been introduced into evidence.

■■ Since the matter must be remanded for a new trial, we shall comment briefly on other claimed errors. The trial court permitted evidence that JACL did not specifically request the Palmer House to provide security for the convention. Since plaintiffs' suit also was based on express or implied warranties relating to security, such evidence was properly admitted. The count dealing with warranties has been dismissed, and such evidence would not be relevant in the new trial.

■■ Plaintiff also complains that the trial court improperly permitted defense counsel to cross-examine Carol regarding certain traumatic events which happened to her after she returned to California. Without detailing the incidents, we believe that the court correctly permitted the cross-examination. Plaintiff claimed permanent psychic damage, including recurrent nightmares, as a result of this incident. Expert medical testimony was adduced that the subsequent events could contribute to these nightmares. The testimony was relevant.

■■ At the close of the evidence, the trial court, correctly we believe, granted plaintiffs' request for a ruling that contributory negligence should not be an issue as to Carol Yamada. No evidence was presented at trial which warranted the submission of such an instruction to the jury. The court, however, submitted two instructions tendered by the defendant dealing with Carol's exercise of due care. One of the instructions informed the jury that they were to decide whether she had exercised ordinary care under the circumstances. It was error to submit to the jury defendant's instructions regarding Carol's exercise of ordinary care.

■■ Defendant raises the issue that, regardless of any error committed in the trial court, the judgment against Mabel Okubo, administrator of the estate of Evelyn Okubo, must stand since Mabel offered no evidence in support of her claim for damages. In a wrongful death action, there is a rebuttable presumption of substantial pecuniary loss to lineal next of kin. (*Hall v. Gillins* (1958), 13 Ill. 2d 26, 147 N.E.2d 352.) The effect of that presumption is to establish a *prima facie* case for the plaintiff and to shift the burden of proving contrary facts negating the presumption to defendant. (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237.) In the present case, Mabel Okubo was entitled to rely upon this presumption and was not obliged to present evidence in support of her claim for damages. The only evidence presented by defendant in mitigation of damages was that Evelyn had no dependants. Standing alone, we cannot say that this evidence is sufficient, as a matter of law, to rebut the presumption of substantial pecuniary loss. We cannot affirm the judgment entered against Mabel Okubo, administrator, on this basis.

Since this case must be remanded for a new trial, we shall consider a conditional cross-assignment of error raised by defendant. Defendant contends that it was error to instruct the jury that defendant owed plaintiffs a duty to exercise a high degree of care for their safety while they were guests of the Palmer House. Defendant cites several cases, none involving hotels, which hold that certain establishments need exercise only a duty of ordinary care to prevent assaults on patrons. (*Boyd v. Racine Currency Exchange, Inc.* (1973), 56 Ill. 2d 95, 306 N.E.2d 39 (currency exchange); *Bezark v. Kostner Manor, Inc.* (1961), 29 Ill. App. 2d 106, 172 N.E.2d 424 (nursing home); *Altepeter v. Virgil State Bank* (1952), 345 Ill. App. 585, 104 N.E.2d 334 (bank).) Defendant concedes that the holdings of *Mrzlak v. Ettinger* (1975), 25 Ill. App. 3d 706, 323 N.E.2d 796, and *Fortney v. Hotel Rancroft, Inc.* (1955), 5 Ill. App. 2d 327, 125 N.E.2d 544, support the instruction tendered by plaintiffs. We find no distinguishing factors in this case which would lead us to deviate from these holdings. There is no error in the instruction given.

For the foregoing reasons, the judgments of the circuit court of Cook County are reversed, and the cause is remanded for a new trial not inconsistent with the holding of this opinion.

Judgments reversed and remanded.

JIGANTI, P. J., and McGILLICUDDY, J., concur.