THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARTHUR LARSON *et al.*, Defendants-Appellants.

Second District   No. 78-230

Opinion filed March 14, 1980.

130

Lance Haddix, of Chicago, for appellants.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Phyllis J. Perko and Martin P. Moltz, both· of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE WOODWARD delivered the opinion of the court:

Following a jury trial, defendants Arthur Larson and Louis French were found guilty of armed robbery. Defendant Larson was sentenced to 15-20 years' imprisonment, and defendant French was sentenced to 50-100 years' imprisonment. Defendants appeal.

The Lizzadro Museum of Lapidary Arts is located in Elmhurst,

Illinois. The museum itself sits in the south portion of Wilder Park, across from Immaculate Conception High School. The museum collection is family-owned and displayed for the public and consists of precious and semiprecious stones, some cut stones, some minerals and fossils, stored in glass cases. The museum itself has two levels; the main level and the lower level where a gift shop, rest-rooms and auditorium are located. On the afternoon of July 1, 1975, the museum was robbed. A yellow Sapphire valued at $55,000 and an Alexandrite valued at $24,000 and a 183-carat Sapphire were found to be missing, as well as several smaller stones. Due to the circumstantial nature of the evidence against defendants, it is necessary to set out the testimony given at trial in some detail.

Judith Greene testified for the State that she was employed as an executive secretary at the Lizzadro Museum and also served as a receptionist to greet patrons as they entered the museum. Her desk and the reception area were on the main floor near the entrance. At about 3:45 p.m. on the afteroon of July 1, 1975, a young girl came into the museum and asked to use the restrooms, which were located downstairs. Ms. Greene gave her permission and the girl went downstairs. The next thing the witness remembered was hearing a very loud crash coming from the center of the main floor of the museum. She estimated that it was about a minute or several minutes between the time the girl went downstairs and the time of the crash. Upon hearing the crash she moved from her desk to the reception counter, approximately three feet away. As she looked over to her right she saw the back of a figure in front of a glass case. She observed something blue in color; she then believed that she was being shot at and dropped under her desk.

George Nicholas, Jr., testified for the State that on July 1, 1975, he was employed at the Lizzadro Museum, selling items in the gift shop and doing odd jobs around the museum. At approximately 3:45 p.m. that day he was working in the back room of the gift shop located on the lower level of the museum, when he heard glass shattering. He then heard what appeared to him to be a couple of shots going off upstairs; then he began walking toward the stairway. Next he observed two men run past him and throw an M-80 (firecracker) at him. The two men ran toward the doorway and Nicholas observed them leave the building through the door on the west side. At that point he was about 20 feet distant from them and had viewed them for two or three seconds. Nicholas stated that while he was "not exactly positive," defendant French resembled one of the two men he saw. Nicholas described one of the men as wearing a blond wig and possibly a blue work shirt. The other man was wearing a white beach hat (a turned-down sailor's hat) with some color to it and seemed to be concealing something large under his clothing. On cross-examination, Nicholas did not remember telling police that both men

were in their mid-20's. He was not sure that he worked on the identikit composite drawing, nor that he saw it that day, and did not remember telling police that the man in the composite was to be in his late 20's, 5'10" tall and weighing 180 pounds. He believed that the man wearing the beach hat had pants cut off at the knee; he did not recall seeing a red wool stocking cap. He remembered something like a nylon stocking covering the face of one of the men, but did not remember telling the police about any nylon stocking; nor did he recall if either man wore glasses. On redirect, Nicholas testified that defendant French looked very much like the man he saw leaving the building.

Terrance Lanigan testified for the State that on July 1, 1975, he was employed as a painter at Immaculate Conception High School, located across the street from the museum in Wilder Park. On that afternoon he was painting a window on the third floor of the high school when he observed two men jogging toward the high school; between them they carried a bag resembling a gym bag. The witness watched the two men until they ran across the parking lot and out of sight. According to Lanigan, one of the men wore a dark shirt and light pants. The witness also observed that one man had what appeared to be a nylon stocking covering his face and he observed a stocking cap on one of the men. Later, on the school grounds, the witness discovered a hammer with reddish stains and tape all over it. According to Lanigan, defendant Larson resembled the man wearing the nylon stocking over his face. Paul Beranek testified for the State that he was working at Immaculate Conception High School with Lanigan at about 3:45 p.m. on the day in question. He also observed the two men jogging and identified defendant Larson as resembling one of the men. However, on cross-examination, Beranek admitted that he was not sure of the identification.

Carol Raimondi testified for the State that about 3:45 p.m. on the day in question she saw two men changing clothes in the bushes adjacent to the Illinois Bell Telephone Company parking lot, located one block east of Wilder Park. One of the men was slender, about 5'7" or 5'8" tall and had a full head of grey hair. Later she returned to the site and found some clothing and a hammer. She subsequently found a multicolored hat by the office building which she said had been worn by the man with the grey hair. On cross-examination, she testified that she did not see the faces of the men she observed.

William Long testified for the State that on July 1, 1975, he was employed by the telephone company. At about 3:45 p.m. he was cleaning up the company parking lot when he noticed two bicycles. As Long was about to lock up the bicycles, a man with long hair, a sweat-band around his forehead, wearing a faded-looking, dirty white undershirt came up to him. According to Long, the man resembled defendant Larson. After

looking at each other for a minute, the man got on one of the bicycles, a three-speed, yellowish tan color with a tan seat, and left. The other bicycle was off-red; afterwards, when Long looked for it, it was gone. Shortly after the man left, Long heard something that sounded like fireworks coming from Wilder Park. On cross-examination, Long denied telling the police that he saw two white male subjects in their late 20's proceed on two bicycles. Long did not observe any tattoos or other identifying characteristics on the man's body. Long described the man as having the beginnings of a moustache and that he told someone about the moustache at the police station, although the identikit which was made up from Long's description had no moustache. Long did not recall telling the police "that the second subject got on a light green, three-speed racer bicycle, English-style, chrome fenders, back seat?" On redirect, the witness stated that defendant Larson was about the height of the man he saw.

Marilyn Lees testified for the State that she had been introduced to defendant French by Alberta Meyer and saw him quite frequently thereafter. Both defendants had stayed at her townhouse in Hoffman Estates. Prior to July 1, 1975, at defendant French's request, she had purchased two dark shirts, the largest she could find. On June 30, 1975, she observed some bicycles attached to the back of her car which defendant French had been driving; one bicycle was yellow with a black seat, and the other was bronze with a camel-colored seat. Defendant French indicated to her that the next day (July 1) would be a big day. Early on July 1, the two defendants left in the car with the bicycles. Either that night or the next day defendant French gave her a couple of pairs of cut-off jeans, a white shirt with embroidery and a sailor hat and told her to burn them. The witness later turned the shirt over to the authorities, the rest she threw out. In the days following the incident the witness and the defendant, French, travelled several times to Chicago or Oak Park. On a trip to a florist, defendant French brought along a stone wrapped in toilet tissue. After having been gone an hour, defendant French came back to the car without the stone and stated that it was being checked out, but that it might not be worth too much. Later the witness was instructed by defendant French to take a jewel box to an attorney. Upon doing so, she subsequently was given an envelope containing money. Meanwhile, the witness picked up a small, dark stone in her vacuum cleaner and saw defendant French breaking up a big boulder on her patio. She also discovered a gold-yellow stone between her mattress and box-springs. On cross-examination, Ms. Lees testified that in 1976 she discussed the problem she was having with her 19-year-old son with Officer Sortino of the Schaumburg police. It was then that she told Sortino about defendant French and the goings-on in her house.

Alberta Meyer testified for the State that she was married to defendant French and that they were divorced in 1968. The witness lived about three blocks from Marilyn Lees in Hoffman Estates, which was about 25-30 minutes from Elmhurst. On July 1, 1975, at about 4:30 p.m., both defendants pulled up to her patio on bicycles; both men were wearing cut-offs. The defendants sat at her kitchen table with some stones; one was like a big rock and the other was gold in color; defendants were putting the rocks on a scale.

Amelia Barthell testified as a court's witness, as requested by the State, that she is the daughter of Alberta Meyer and the defendant, French. She arrived at her mother's house about 5 p.m. on July 1, 1975. The two defendants were seated at her mother's kitchen table looking at some stones on the table. The witness had also lived with Marilyn Lees after July 1, 1975. While she lived there she observed defendant French empty out a vacuum cleaner and discover a small, black stone. The witness denied going to the Lizzadro Museum on July 1 or opening the museum doors for the defendants; however, she admitted that she had told the Du Page County grand jury that she had opened the doors for the museum on the day in question to enable the two defendants to enter.

Elmhurst police officer Charles Schwaegerman testified that at the museum on the day in question he was given two unexploded M-80 firecrackers and a ball peen hammer with a taped handle. The witness observed broken glass on the floor near the display case. Elmhurst police officer Joseph Winkler testified that he recovered certain objects, namely, a blond, short-haired wig, an article of blue clothing and a hammer in an area near the Masonic Hall, about one block from the museum. These pieces of evidence were turned over to the evidence technician. Officer Richard Hargreaves, the evidence technician, testified as to the chain of custody of the various items of evidence. One of the pockets of the blue garment contained two M-80 firecrackers, some tape and a brochure from the Lizzadro Museum. Lawrence Mulcrone, special agent for the Illinois Department of Law Enforcement, testified for the State that he received two pieces of rock and a white, embroidered T-shirt from Marilyn Lees. From Irwin Cohen the witness received a ring with a green stone.

John Fernandez testified for the State that defendant French came into his store in the fall of 1975 and stated something about a big robbery with bicycles; he also mentioned firecrackers. Irwin Cohen testified that in the summer of 1975 he received a ring from defendant French. In June 1977, he gave the ring to agent Mulcrone.

Officer Charles Schwaegerman testified for the defense that he had spoken with Judith Greene following the robbery, that she was very shaken up, and stated that she had only caught a glimpse of the robbers and was not sure how good her description would be. She described both

men as Caucasians in their late 20's. George Nicholas told Schwaegerman that one of the men was about 30, about 5'9" tall with a slender build; the second man, according to Nicholas' description, was younger, 5'10" tall with a medium to stocky build.

Defendant Louis French testified that he won a ring in a card game with Irwin Cohen and a friend of John Fernandez' named Mikie Salano, who had lost money in the game and borrowed from defendant French against the ring. Defendant French gave the ring to Cohen to whom defendant French had lost money and never saw the ring again; nor had he ever seen it before. The witness testified that he and defendant Larson had been in Alberta Meyer's home in August of 1975 and had discussed the contracting business. Defendant French denied ever having been to the Lizzadro Museum, denied ever seeing the hammers which were in evidence, or the M-80 firecrackers. The witness stated that he was not at Alberta Meyer's house when the rocks and stones were displayed. He also denied meeting defendant Larson before that day in August at his ex-wife's house. Defendant French denied directing Marilyn Lees to a shop, going in and returning with money.

Delores Crahton testified for the defense that she is defendant Larson's mother and that her son had tattoos on his arm. Mrs. Crahton further testified that at approximately 3 p.m. on July 1, 1975, defendant Larson and his wife, Judy, the witness and the witness' other son, Frank, and his wife left by car to drive to Johnson City, Illinois, to visit the witness' father, who was gravely ill; they arrived in Johnson City around 10 p.m. on the same day. Defendant Larson stayed the weekend, returning to northern Illinois the following Tuesday. Mrs. Crahton's testimony was corroborated by the testimony of defendant Larson's wife, Judy, and a co-worker of Judy's, Janet Baranowski.

Defendant Larson and defendant French stood back to back to demonstrate that they were both about the same height. Defendant Larson then displayed for the court the tattoos on his arm. Defendant Larson testified that on July 1, 1975, he left with the other members of his family around 2 p.m. for Johnson City, Illinois, and arrived there about 10 p.m. He stayed in Johnson City six or seven days. He denied ever going to the Lizzadro Museum in Elmhurst. He further denied being at Marilyn Lees' house. Following closing arguments, the jury found the defendants guilty of armed robbery, and the defendants were sentenced as stated above. They now bring this appeal.

■■ Defendants contend first that there was insufficient evidence to find them guilty beyond a reasonable doubt. The State concedes that the evidence against the defendants is primarily circumstantial; however, it is well settled that a conviction can be sustained on circumstantial evidence. (*People v. Burke* (1979), 71 Ill. App. 3d 242, 389 N.E.2d 265.) Generally,

circumstantial evidence which produces a reasonable and moral certainty that the accused committed the crime is sufficient to justify a conviction: the test is whether the evidence as a whole shows that the accused and no one else committed the crime. (*People v. Marino* (1970), 44 Ill. 2d 562, 256 N.E.2d 770.) Further, to warrant a conviction of a crime on circumstantial evidence, the facts proved must so thoroughly establish the guilt of the accused as to exclude every reasonable hypothesis of his innocence. *People v. Grizzel* (1943), 382 Ill. 11, 46 N.E.2d 78.

Rather than repeat the details of the testimony set forth above in this opinion, suffice it to say that we believe the testimony by the State's witnesses wove a strong web of circumstantial evidence about the defendants. The testimony of Marilyn Lees outlining the activities of the defendants both prior to and following the robbery leads to the almost inescapable conclusion as to the involvement of both defendants in the robbery of the museum. Ms. Lees' testimony was further corroborated by the testimony of defendant French's ex-wife, Alberta Meyer, and his daughter, Amelia Barthell. Both Alberta and Amelia testified that they saw the defendants at the Meyer home with stones; later, Amelia saw defendant French empty one of these stones from a vacuum cleaner in the Lees home. Marilyn Lees also testified as to having found a yellow stone between her mattress and box-springs.

While none of the occurrence witnesses were able to positively identify either of the defendants, according to witness George Nicholas, defendant French resembled one of the two robbers; three other witnesses testified that defendant Larson resembled the other man. Witness William Long testified that a man resembling defendant Larson rode off on a bicycle similar to the one attached to Marilyn Lees' car. Also, found near the scene of the robbery was a blue shirt, similar to the ones Marilyn Lees had been instructed by defendant French to purchase and which had also been observed by Judith Greene in the museum. In one of the pockets, the police discovered two M-80 firecrackers, some tape and a brochure from the Lizzadro Museum. Further, John Fernandez testified as to a conversation with defendant French in either the summer or fall of 1975, in which French made reference to a robbery involving firecrackers and bicycles.

■ While defendants argue that no positive identifications were made by any of the State's witnesses, it is well settled that the identity of an accused may be established by circumstantial evidence. (*People v. Darrah* (1974), 18 Ill. App. 3d 1018, 310 N.E.2d 448.) While the State concedes that the identifications were somewhat tentative, there were several identifications which were sufficient to conclude that the defendants strongly resembled the two robbers. Therefore the State submits, and we agree, that given the large amount of circumstantial evidence strongly

demonstrating that the defendants were the two robbers, direct evidence in the form of positive identifications was unnecessary in view of the overwhelming evidence linking the defendants to the crime. Further, discrepancies as well as any weakness in the manner in which identification is made only affects the credibility of the witness and the weight to be given his or her testimony; "it is the task of the trier of facts to 'evaluate the weight to be given to the discrepancies.' [Citation.]"; and the decision of the trier of fact will not ordinarily be disturbed on appeal. (*People v. Nichols* (1975), 32 Ill. App. 3d 265, 268, 336 N.E.2d 194, 196.) There appears no compelling reason to disturb the decision of the jury in the present case.

While defendant Larson alleged an alibi defense, it is well established that the jury is not obligated to believe alibi witnesses. (*People v. Polk* (1973), 10 Ill. App. 3d 408, 294 N.E.2d 113.) The alibi testimony merely created an issue of fact to be determined by the jury. (*People v. Toles* (1975), 30 Ill. App. 3d 837, 335 N.E.2d 188.) While defendant Larson, his wife and his mother testified that they left for Johnson City about 1½ hours prior to the time of the robbery, the State's witnesses testified that Larson was at Alberta Meyer's residence the afternoon-and evening after the robbery was committed; in addition, there was also testimony that defendant Larson resembled one of the robbers.

■■ Therefore, we conclude that there was sufficient circumstantial evidence from which the jury could find the defendants guilty of armed robbery beyond a reasonable doubt.

Next, defendants contend that the trial court committed reversible error when it made Amelia Barthell a court's witness. Prior to calling Amelia, the prosecutor moved that she be called as a court's witness. In support of the motion, the prosecutor informed the trial court that although Amelia's grand jury testimony had been that she had opened the doors of the museum for the defendants, he had reason to believe that she would recant this earlier testimony. Over the objections of the defendants, the trial court granted the State's motion and made Amelia a court's witness.

■■■ Whether a person should be called as a court's witness is a decision within the discretion of the trial court, and that decision will not be disturbed on review absent an abuse of discretion. (*People v. Robinson* (1977), 46 Ill. App. 3d 713, 361 N.E.2d 138.) However, the party asking the court to adopt the witness must lay a proper foundation which "would necessarily consist of the reasons why the party desiring the witness cannot vouch for his veracity, and showing that the testimony of the witness will relate to direct issues and is necessary to prevent a miscarriage of justice." (*People v. Moriarity* (1966), 33 Ill. 2d 606, 615, 213 N.E.2d 516, 521.) In *People v. DeFord* (1978), 59 Ill. App. 3d 942, 376

N.E.2d 97, the court held that a proper foundation had been laid upon a showing the witness was the defendant's brother, and that he had already changed his story at least once. Here, Amelia was defendant French's daughter, and although she had previously testified before the grand jury that she had opened the doors of the museum for the defendants, as the prosecutor feared, at trial she testified that she had never been to the Lizzadro Museum. Further, her testimony was directly related to the issue of whether the defendants were present at the museum at the time of the robbery, a significant issue in the case. Therefore, we conclude that it was not error to call Amelia Barthell as a court's witness.

Next, the defendants contend that reversible error was committed when the trial court instructed the jury orally rather than in writing and singled out a witness in the oral instruction. At the conclusion of the State's direct examination of Amelia, the witness admitted that she had given a contrary version of the events of July 1 to the grand jury. Over the objection of the defendants, the trial court drafted and orally gave the following instruction to the jury:

> "Ladies and gentlemen of the jury, the Court admonishes you that the testimony just given by the witness, Amelia Barthell, was received for a limited purpose explained as follows.
>
> It is proper to impeach or discredit a witness by proving statements made by such a witness at some other time and place different from the testimony in this case on trial.
>
> Still, any statement that any witness may have made at such other time and place is not to be considered by you as any evidence as to the guilt or innocence of the defendant or either of them.
>
> Evidence that on some former occasion a witness made a statement different from or inconsistent with this testimony in this case should only be considered by you in deciding the weight to be given to that witness' testimony."

In *People v. Van Riper* (1970), 127 Ill. App. 2d 394, 262 N.E.2d 141, certain evidence was admitted for the limited purpose of showing knowledge or intent on the part of the defendant and the jury so instructed at the end of the trial. However, this court stated that the better practice would have been for the trial court to have instructed the jury as to the limited scope of the evidence coincidentally with its introduction. Further, we note that the following written instruction was tendered to the jury without objection:

> "Evidence that on some former occasion a witness made a statement inconsistent with his testimony in this case, may be considered by you in deciding the weight to be given to the testimony of that witness."

Therefore, this is not a case in which an oral instruction was given in the absence of a written instruction, and thus the cases of *People v. Callopy* (1934), 358 Ill. 11, 192 N.E. 634, *People v. Kelly* (1931), 347 Ill. 221, 179 N.E. 898, and *Ellis v. The People* (1896), 159 Ill. 337, 42 N.E. 873, are inapposite. Further, with regard to *People v. Horn* (1923), 309 Ill. 23, 140 N.E. 16, and *People v. Bydalek* (1942), 313 Ill. App. 631, 40 N.E.2d 595, in *Horn* the ruling was held not to be within the statute requiring instructions to be in writing, and in *Bydalek* the court held that a direction as to the form of verdict is not an instruction on the law of the case. Therefore, these cases are distinguishable as well from the case at bar.

■■ Nor can we discover any prejudice to the defendants with regard to the fact that the oral instruction referred to the witness, Amelia Barthell, by name. We conclude, therefore, that under the circumstances presented here the trial court did not err in giving the jury an oral instruction.

Next, defendants contend that they were denied a fair trial by the admission into evidence of two hammers, People's exhibits Nos. 4 and 5. Defendants argue that the State failed to show that hammers were connected to the crime, that defendants owned them, or how long the hammers had been where they were found.

Terrance Lanigan testified that he found a hammer with reddish stains and adhesive tape on the handle (People's exhibit No. 5) in the area where he had observed two men jogging, one of whom resembled defendant Larson. A second hammer (People's exhibit No. 4) was found together with some discarded clothing in the area where witness Carol Raimondi testified she observed two men changing clothes. Further, there was testimony that there was broken glass on the floor of the museum near the display cases.

■■ A physical item may not be admitted into evidence unless it is connected to both the defendant and the crime. (*People v. Jones* (1961), 22 Ill. 2d 592, 177 N.E.2d 112.) However, proof of such connection may be circumstantial; additionally, there is no necessity to demonstrate that an object admitted into evidence was actually used, but only that the object was suitable for the commission of the crime. (*People v. Fletcher* (1978), 66 Ill. App. 3d 502, 383 N.E.2d 1285.) In *Fletcher*, the court recognized that more than one inference could be drawn from the defendant's possession of a certain item, nevertheless, the inference could be reasonably drawn by the jury and was a logical one, and, therefore, the court held that the evidence was properly admitted.

■■ Similarly, here both hammers were found in areas where defendants appeared to have been, or where other evidence linking them to the robbery was discovered. Further, the testimony concerning the sounds of glass shattering and the broken glass around the display case leads to the conclusion that the defendants used hammers to break the cases open, a

logical inference which the jury could reasonably have drawn from the evidence. Compare *People v. Fletcher.*

Defendants also point out that a hair found on People's exhibit No. 4 was never sent to the crime lab for comparison. The State concedes that fact but argues that this should not affect the admissibility of the hammer because of the hammer's connection to both the crime and the defendants. While of no probative value itself, the hair was part of a duly admitted exhibit, and we see no prejudice to the defendants in its admittance. Therefore, we conclude that the admission of People's exhibits Nos. 4 and 5 did not deprive defendants of a fair trial.

Next, defendants contend that the trial court erred when it refused to give defendants' definition of the word "explosive". At the conference on instructions, defendants tendered an instruction defining the word "explosive", which was a direct quotation of section 2 of "An Act regulating * * * explosives" (Ill. Rev. Stat. 1975, ch. 93, par. 144(1), now Ill. Rev. Stat. 1977, ch. 96½, par. 4802), which, *inter alia*, contained the following statement:

> "* * * Manufactured articles such as fixed ammunition for small arms, fire crackers, safety fuse, matches, et cetera, shall not be held to be explosives when the individual units contain explosives in such limited quantity, of such nature or in such packing that it is impossible to produce a simultaneous or a destructive explosion of such units, to the injury of life, limb or property."

In refusing the instruction, the trial court ruled that the jury was qualified to say what an explosive was.

We note first that this instruction is not an Illinois Pattern Jury Instruction (hereinafter IPI). It is well settled that IPI instructions are preferred to non-IPI instructions. (*People v. Maxey* (1976), 37 Ill. App. 3d 905, 346 N.E.2d 51.) Further, the decision whether to give a tendered non-IPI instruction is, of course, always within the discretion of the trial court. (*People v. Hines* (1975), 28 Ill. App. 3d 976, 329 N.E.2d 903.) We are of the opinion that the trial court did not abuse its discretion in refusing the instruction.

■■ Although refusing the instruction defining "explosive," the trial court did give IPI Criminal No. 14.01 (1968), defining the crime of armed robbery and setting out its essential elements, including the fact that the assailant must be armed with a dangerous weapon. Further, it is clear that the meaning of the word "explosive" was not at issue. In the case at bar, M-80 firecrackers were thrown at both Judith Greene and George Nicholas. Whether, in fact, the M-80s constitute explosives is unnecessary to determine, since even innocuous items can be classified as dangerous weapons depending upon the circumstances of the case. (See *People v.*

*Hill* (1977), 47 Ill. App. 3d 976, 362 N.E.2d 470.) We are satisfied that the jury in this case was able to determine whether or not the M-80s constituted dangerous weapons under the instructions given. We have reviewed the cases relied on by defendants and conclude that they are distinguishable from the case at bar. In any event, since the instructions as a whole informed the jury of the facts essential to the proof of the commission of the offense in question, refusal to give the instruction could not be considered so prejudicial so as to require a reversal. See *People v. Hyde* (1971), 1 Ill. App. 3d 831, 275 N.E.2d 239.

Next, defendants contend that it was reversible error to introduce a nylon stocking (People's exhibit No. 2) into evidence, where the State failed to show a continuing chain of custody.

The State relies on *People v. Sansone* (1976), 42 Ill. App. 3d 512, 356 N.E.2d 101, wherein this court stated:

> "The rule is well established that a foundation for the admission in evidence of an object may be laid either through its identification by a witness or through establishment of a chain of possession. [Citation.] To require both identification of the object by a witness and establishment of a chain of possession would impose an unnecessary burden and would not assure a fairer trial to the accused. [Citations.]
>
> \* \* \* The prosecution was not required under the circumstances to exclude all possibility of tampering. All that is required is that there be only the reasonable probability that the article has not been changed in any important respect. [Citation.]" 42 Ill. App. 3d 512, 514, 356 N.E.2d 101, 103.

In the case before us, Terrance Lanigan testified that People's exhibit No. 2 resembled the nylon stocking covering the face of one of the men he observed, and that as far as resemblance, the nylon stocking appeared to be in the same condition as the nylon stocking he observed on the day in question. Nor was there any evidence or suggestion that the nylon stocking had been tampered with. Therefore, we are satisfied that the exhibit was properly introduced into evidence. In any event, assuming arguendo that it was error to introduce the exhibit, given the other evidence against the defendants, the error was harmless beyond a reasonable doubt.

Next, defendants contend that the trial court committed reversible error when it refused to allow the defense to impeach Marilyn Lees. On cross-examination, Ms. Lees testified that she saw the defendants breaking up a rock on her patio. The witness was then questioned as to her whereabouts on that day. Initially, she testified that she did not recall her whereabouts on that day; however, defense counsel made reference to the fact that in her grand jury testimony she had stated that on that day

she had picked up her son from summer school, and the witness acknowledged the statement was correct. Later, the defense moved to call two witnesses from the elementary and high schools where Ms. Lees testified her children attended school, who would testify that there were no records of either of Ms. Lees' sons enrolled in summer school. The trial court refused to allow such impeachment on the ground that it was "irrelevant, immaterial, and having no probative value whatsoever."

■■ The more general rule is that the widest latitude should be allowed the defendant in cross-examination for the purpose of establishing bias, motive, prejudice, or interest on the part of the witness. (*People v. Garrett* (1976), 44 Ill. App. 3d 429, 358 N.E.2d 364.) Collateral matters may be gone into on cross-examination for the limited purpose of testing the witness' credibility. (*People v. Agosto* (1979), 70 Ill. App. 3d 851, 388 N.E.2d 1018.) However, the latitude to be allowed in cross-examination rests in the sound discretion of the trial court. (*People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 292 N.E.2d 387.) A court of review will not find reversible error where cross-examination might have been unduly restricted unless there was a clear abuse of this discretion, resulting in manifest prejudice. *People v. Hubbard* (1973), 55 Ill. 2d 142, 302 N.E.2d 609.

■■ Defendants argue that Ms. Lees' testimony concerning her sons' attendance in summer school was a material issue since Ms. Lees based her entire recollection upon that fact. However, a review of the record here reveals that at trial Ms. Lees mentioned her sons' attendance at summer school only in connection with her observance of defendants breaking up a rock on her patio several days after the robbery. Rather, we agree with the State that the question as to whether Ms. Lees' sons were in summer school during the first part of July 1975 was a minor and totally collateral point. In *People v. McGhee* (1974), 20 Ill. App. 3d 915, 314 N.E.2d 313, the court held that rebuttal witnesses cannot be called to contradict a defendant's testimony as to a collateral or immaterial matter. We are of the opinion that the same reasoning should apply here, and that the trial court correctly refused to allow impeachment of Ms. Lees' testimony on that point. See *People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14.

Next, defendants contend that assuming they committed the acts in question, they should not have been found guilty of armed robbery, but rather, either robbery or burglary, and therefore their convictions should be reduced accordingly.

■■ At the outset, we observe that defendants' convictions may not be reduced to burglary since burglary is not a lesser included offense of armed robbery. The offense of burglary is defined as follows:

"(a) A person commits burglary when without authority he

knowingly enters or without authority remains within a building, housetrailer, watercraft, aircraft, motor vehicle as defined in The Illinois Vehicle Code, railroad car, or any part thereof, with intent to commit therein a felony or theft." (Ill. Rev. Stat. 1975, ch. 38, par. 19—1(a).)

For an offense to be a lesser offense and included in another, greater offense, it is necessary that the greater offense include every element of the lesser offense plus one or more other elements. (*People v. Thompson* (1977), 55 Ill. App. 3d 795, 371 N.E.2d 326.) As can be seen from the above definition, one of the elements of burglary is that the offense must be committed in some type of enclosure or building. However, the offense of armed robbery is not so limited, and therefore we decline to reduce defendants' convictions to burglary.

Alternatively, defendants assert that the offenses of robbery and armed robbery are directed against persons, not places or things. They argue that the evidence did not show that they took property from a person against the person's will while armed with a dangerous weapon as required by the armed robbery statute (see Ill. Rev. Stat. 1975, ch. 38, par. 18—2) in that the evidence failed to show that defendants were armed with hammers while in the museum, nor did Judith Greene testify that anyone threatened her with a hammer. The defendants also observe that while denying their motion for a directed verdict, the trial court indicated that it was "bothered" by the fact that the hammer was not seen by anyone, nor was it used to threaten anyone and that the case was in that respect "tough."

In response, the State contends that a conviction for armed robbery may be sustained even though the weapon itself is neither seen nor accurately described by a victim. (*People v. DuPree* (1979), 69 Ill. App. 3d 260, 387 N.E.2d 391; *People v. Elam* (1972), 50 Ill. 2d 214, 278 N.E.2d 76.) Further, the State argues that although Judith Greene may not have seen the hammers, she apparently did have the opportunity to view the explosion of the M-80 firecracker. She testified that she saw a flash and thought she was being shot at. The State also points out that George Nicholas also testified that the robbers threw an M-80 firecracker at him as well.

We consider first whether the acts of the defendants constituted robbery. Section 18—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 18—1(a)) provides:

"(a) A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force."

In the recent case of *People v. Smith* (1980), 78 Ill. 2d 298, 399 N.E.2d 1289, our supreme court rejected a defendant's contention that his acts

amounted to theft by threat rather than robbery, where in two separate incidences defendant called stores and threatened to detonate bombs he had allegedly planted there unless the managers placed $10,000 in specified places. Defendant argued that in both cases the evidence failed to show a taking from the person or presence of a victim, an essential of robbery. Our supreme court stated:

"The requirement that there be a taking 'from the person or presence' is not, however, limited to removal of the property from the victim's person or from the immediate presence of the owner, possessor or custodian.

In *People v. Braverman* (1930), 340 Ill. 525, the victims were locked in a back room of a drug store while property was taken from the store. This court found that the requirement of a taking from the person or presence was met when the property was in the possession or control of the victim and the robber used violence or fear of violence as the means to take it. *People v. Braverman* (1930), 340 Ill. 525, 531. [Citations.]
* * *

The presence requirement of the robbery statute relates to the property taken; it must have been in the presence or control of the victim. The offense of robbery is complete when force or threat of force causes the victim to part with possession or custody of property against his will. In this case, the property was in the actual control and in the presence of each of the managers, and each was compelled, by the defendant's threats of force, to give up such property. The elements of robbery were therefore present."
(*People v. Smith* (1980), 78 Ill. 2d 298, 303-04.)

See also *People v. Kennedy* (1973), 10 Ill. App. 3d 519, 294 N.E.2d 788; but see *People v. King* (1979), 67 Ill. App. 3d 754, 384 N.E.2d 1013.

■■ ■ Admittedly, the facts in this case do not present the usual scenario for the crime of robbery. However, we believe the evidence shows that the stones and gems taken by the robbers were taken from the presence of Judith Greene and that the fact she believed that she was being shot at indicated that the robbers were using force or the threat of force to compel her to part with custody of the gems and stones, which were in her presence and control by virtue of her employment with the museum. Therefore, we are satisfied that the elements of robbery were present.

■■ We now turn to whether defendants were properly convicted of armed robbery. A person commits armed robbery when he commits robbery while armed with a dangerous weapon. (See Ill. Rev. Stat. 1975, ch. 38, par. 18—2(a).) It is the province of the jury to decide whether or not the accused is guilty of the crime charged or a lesser included offense, if there is any evidence which tends to prove the lesser rather than the

greater crime. (*People v. Thompson* (1976), 35 Ill. App. 3d 773, 342 N.E.2d 445.) We are of the opinion that given all the evidence in this case, the jury could reasonably determine that the defendants were armed with at least one or more dangerous weapons, and, therefore, defendants were properly found guilty of armed robbery.

Finally, defendants contend that the State knowingly used perjured testimony to obtain their convictions, and therefore, their convictions should be reversed. Defendants argue that Marilyn Lees committed perjury regarding the issue of her sons' attendance in summer school; that despite this outright perjury the State objected to hearing the true facts through the defense's attempted impeachment of Ms. Lees by the witnesses from the school districts. While the trial court refused to let these witnesses testify, the defense made an offer of proof that neither son had been in school on the day Ms. Lees stated they were, nor had they been in school for approximately two or three weeks prior thereto.

■■ Defendants cite ample authority for the proposition that the use of perjured testimony and the failure of the State to correct it once it becomes evident constitute a denial of due process as well as reversible error. Section 32—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 32—2(a)) defines perjury as follows:

> "A person commits perjury when, under oath or affirmation, in a proceeding or in any other matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true."

Based upon the above definition, we are of the opinion that even if Ms. Lees was mistaken about the dates her sons attended summer school, defendants have not established that Ms. Lees did, in fact, give perjured testimony at trial. Further, we are convinced on the basis of the record before us that there is not a reasonable possibility that the testimony complained of might have contributed to the conviction of defendants, or even if perjured, was harmless beyond a reasonable doubt. *People v. Bracey* (1972), 51 Ill. 2d 514, 283 N.E.2d 685.

We therefore affirm the judgment of the circuit court of Du Page County.

Affirmed.

LINDBERG and VAN DEUSEN, JJ., concur.