THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DENNIS BRYANT, Defendant-Appellant.

First District (2nd Division)   No. 80-1112

Opinion filed September 1, 1981.

Ralph Ruebner and Eva Field, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, George M. Velcich, and Gino P. Naughton, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Following a jury trial, defendant Dennis Bryant was convicted on two counts of armed robbery. Defendant appeals, contending that identification testimony should have been suppressed, that the trial court erred in allowing a witness to be called as a court's witness and in permitting the impeachment of that witness, that he was not proved guilty beyond a reasonable doubt, that the prosecutor made improper and prejudicial remarks in his closing argument, and that the trial court erred in entering judgment on two convictions when both counts arose from a single act.

At about 6:30 a.m. on December 31, 1978, a 7-Eleven food store on Howard Street in Evanston was robbed. The only witnesses to the robbery were Harold and Norma Lederer. Harold was the night manager of the 7-Eleven. His wife Norma had come to the store to pick up Harold at the end of his shift. A black male entered the store and announced a stickup. Brandishing a pistol, he forced Harold to open the cash register and the store's safe. The robber pocketed loose change and small bills from the register and several packages of bills from the safe that had been counted and wrapped in register tape.

The store was brightly lit, and the Lederers had several minutes to

observe the robber. The man's face was masked by a white cloth, apparently torn from a bedsheet, that came over the bridge of his nose and was tied behind his head. He wore a blue knit cap with an orange tassel; the cap was pulled low on his forehead, about half an inch above his eyebrows. The robber wore a blue denim jacket and light blue pants. At trial, Norma Lederer testified that she was able to discern some of the robber's facial features as the robber moved and the mask conformed to his face. Norma observed that the robber had high cheekbones and a prominent jaw line.

Prior to leaving the store the robber ordered the Lederers to lie on the floor. Harold complied but Norma ignored the order. The gunman slapped Norma's face and then left the store. Harold immediately called the police but was too nervous to describe the offender. Norma took the phone and gave police a description of the robber.

Evanston police immediately responded to the call. Officer Douglas Glanz, proceeding in the direction of the 7-Eleven, aimed his squad car's spotlight at the drivers of oncoming cars. In one oncoming car, a white and aqua Cadillac, Glanz observed a black male wearing a blue knit cap with an orange tassel. Glanz immediately activated the car's Mars lights and turned to follow the Cadillac. A chase ensued. After several blocks, the Cadillac entered an alley that was blocked by an abandoned auto. The driver of the Cadillac then fled on foot. Glanz pursued on foot, noting that there were no other occupants of the Cadillac.

In the course of the chase, the suspect vaulted a chain link fence. Glanz climbed the same fence, sustaining a puncture wound on his left palm. Glanz fell behind in the chase but was able to follow the suspect's footprints, as the ground was covered with 3 inches of fresh snow. The pursuit on foot covered several blocks. Glanz followed the footprints to the basement entrance to a dwelling. By this time, another police officer had caught up with Glanz. The door to the basement apartment was standing open, and the two officers entered the basement. After ascertaining that the back door to the basement was locked, the officers concluded that the suspect was still in the basement. The officers then looked in the bedrooms of the basement apartment. In one room, they found a black male talking on the phone. They took this individual, later identified as Early Patterson, to a squad car outside. At trial, Glanz testified that Patterson said, "It's not me you want. It's my nephew. He is still hiding behind the refrigerator." Other officers then found the defendant, Dennis Bryant, crouching next to a refrigerator. After a brief struggle, defendant was placed under arrest. The arresting officers observed that defendant wore a blue denim jacket and blue pants, and that his shoes and pants cuffs were wet. The officers also found packages of dollar bills wrapped in register tape in defendant's pockets. At the

police station, Glanz noted that defendant had a puncture wound on his hand similar to the wound on Glanz's left palm. Glanz also noticed a tear in defendant's pants.

In the abandoned Cadillac, police found a blue knit cap with an orange tassel, a .32-caliber automatic pistol, two pieces of white cloth torn from a bedsheet, and an amount of rolled coins and loose change. The Cadillac was registered to defendant and his mother.

At trial, Norma Lederer testified that, on the afternoon of December 31, she was called to the Evanston police station to view "some objects." Police displayed a gun, a white cloth, and a blue knit cap to Mrs. Lederer. She identified these objects as the ones used by the robber. The police also showed Mrs. Lederer an array of photographs. Five of the photos were police "mug shots," incorporating frontal and side views of the subjects and containing identification numbers. One picture was a frontal picture taken by a Polaroid camera. This was defendant's picture, and this was the picture selected by Norma Lederer. At trial, the six photos were introduced in evidence, and Mrs. Lederer was allowed to testify to the identification made at the police station. Over defendant's objection, Mrs. Lederer was also allowed to identify defendant in court. Harold Lederer also identified defendant at trial, but the strength of this identification was diminished by Harold's imperfect recollection of the robber's appearance and by the fact that Harold had been afforded a clear view of defendant at the preliminary hearing. Harold did not identify defendant's picture from the photo spread. Harold was able to identify the packages of bills wrapped in register tape that were taken from defendant at the time of his arrest.

After eliciting testimony from the Lederers and Officer Glanz, the State sought to call Early Patterson. The State advised the trial court that Patterson had given evasive answers in prior discussions with the prosecutors and the State requested the trial court to call Patterson as a court's witness. The trial court declined to call Patterson as a court's witness, but found that Supreme Court Rule 433 (Ill. Rev. Stat. 1979, ch. 110A, par. 433) applied and the court allowed the State to call Patterson as a hostile witness. On direct examination, Patterson described his encounter with the police on the morning of December 31. The prosecutor asked Patterson if, prior to the arrival of the police, defendant had admitted that he had committed a robbery. Patterson denied hearing such an admission. The State then proceeded to impeach Patterson with a statement Patterson had given to a police detective.

"Q: Was this question asked of you, Mr. Patterson, by Detective Haytow, and did you give these answers: 'Q Mr. Patterson, will you tell me what you know of this armed robbery? A Dennis Bryant came down in the basement. I went down behind him. I

asked him what was wrong. He said the police had just taken his car. He said he just robbed a 7-Eleven, I think that's what it was.' Now, was that the question asked of you by Detective Haytow, and did you give that answer?

A: I don't even know if the question was asked, but I know definitely for sure I think, like I told you, I was under the influence of alcohol at the time. I don't know what was going on.

\* \* \*

THE COURT: Okay. Just answer the question, sir.

THE WITNESS: I don't know."

Later the State completed the impeachment by offering the testimony of Detective Haytow, who stated that Patterson had given an oral statement, and that Haytow had typed the statement and Patterson had signed it. Haytow acknowledged that the question and answer cited above were included in Patterson's statement. On cross-examination by defendant, Patterson testified that he had been up all night drinking and that he is unable to read. Patterson stated that he signed the statement, not knowing what it said, because he "wanted to get out of there."

The State has confessed error regarding one of the issues on appeal. Defendant argues, and the State now agrees, that he was improperly convicted of two counts of armed robbery, in that he was separately convicted of the armed robbery of Harold Lederer and the armed robbery of Norma Lederer. The robbery involved only the contents of the 7-Eleven's cash register and safe and no property was taken from Norma Lederer. These facts do not support two separate convictions for armed robbery. See *People v. Chaka* (1977), 55 Ill. App. 3d 470, 473-74, 371 N.E.2d 74; *People v. Hunter* (1976), 42 Ill. App. 3d 947, 951, 356 N.E.2d 822.

Defendant also contends that the trial court erred in refusing to suppress Norma Lederer's in-court identification of defendant. Defendant argues that the pre-trial photo array was impermissibly suggestive and that the subsequent in-court identification was thereby tainted. Defendant cites *Simmons v. United States* (1968), 390 U.S. 377 19 L. Ed. 2d 1247, 88 S. Ct. 967, where the Supreme Court noted that the danger of mis-identification is increased if the photograph of any one individual is in some way emphasized. (*Simmons*, 390 U.S. 377, 383, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971.) The court further stated that, "[T]he witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." *Simmons*, 390 U.S. 377, 383-84, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971.

In *People v. Beyah*, (1979), 72 Ill. App. 3d 690, 391 N.E.2d 96, the court considered a photo array similar to that in the case at bar. In *Beyah*, a

witness was presented with 11 mug shots and one Polaroid picture of the defendant. The court in *Beyah* found that the procedure tended to emphasize the defendant's picture in a suggestive manner. (*Beyah*, at 695.) The court went on to say that where there has been an improper pretrial identification procedure, the State must prove by clear and convincing evidence that the witness' in-court identification of the defendant was uninfluenced by the suggestive pretrial procedure. (*Beyah*, at 696; see also *People v. Calhoun* (1973), 11 Ill. App. 3d 600, 603-04, 297 N.E.2d 304.) A paramount consideration in this matter is the witness' opportunity to view the suspect at the time of the offense. *Beyah*, at 696.

■■ In the instant case, the robber's face was continually masked. When Norma Lederer viewed the photo array, on the same day as the robbery, she was already aware that the police had made an arrest, since she had seen the hat, the gun, and some of the proceeds of the robbery. Mrs. Lederer could have deduced that the Polaroid picture was that of the arrestee, since an "instant picture" connotes a quality of recency absent in "mug shots." Norma Lederer testified that she made her selection based on her observations of the robber, but this claim is not convincing. The test of an unnecessarily suggestive identification procedure depends on the facts and circumstances of each case. (*Simmons*, 390 U.S. 377, 383, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971; *People v. Lee* (1969), 44 Ill. 2d 161, 169, 254 N.E.2d 469.) Exigent circumstances sometimes render a suggestive procedure imperative (see *Lee*, at 169), but the instant case reveals no circumstances that prevented a nonsuggestive procedure. The defendant was in custody and could have been made available for a lineup. (*Cf. People v. Holiday* (1970), 47 Ill. 2d 300, 307, 265 N.E.2d 634 (photographic identification should not be employed when lineup is feasible).) We find that the photo array was impermissibly and unnecessarily suggestive and that the State has not supplied clear and convincing evidence that the in-court identification was based on Norma Lederer's observations at the time of the robbery, rather than her viewing of defendant's photograph. It follows that the trial court erred in admitting testimony regarding the pretrial identification and in allowing the in-court identification.

Defendant's next contention on appeal is that the trial court erred in allowing the State to call Early Patterson as a hostile witness and permitting the State to impeach Patterson with proof of his prior statement to police. The State asked to call Patterson as a court's witness; the trial court found that Patterson was more properly called under Supreme Court Rule 433. Our review of the action taken below necessitates an examination of both theories.

■■ Supreme Court Rule 433 states only that, "The examination of hostile witnesses in criminal cases is governed by Rule 238." (Ill. Rev. Stat. 1979, ch. 110A, par. 433.) Supreme Court Rule 238 states:

"If the court determines that a witness is hostile or unwilling, he may be examined by the party calling him as if under cross-examination. The party calling an occurrence witness, upon the showing that he called the witness in good faith and is surprised by his testimony, may impeach the witness by proof of prior inconsistent statements." (Ill. Rev. Stat. 1979, ch. 110A, par. 238.) The first question is whether Early Patterson displayed the requisite hostility. The fact that a witness may be unsympathetic to the calling party's case is, of itself, insufficient to show hostility as required by Rule 238. (See *Yamada v. Hilton Hotel Corp.* (1977), 60 Ill. App. 3d 101, 109, 376 N.E.2d 227.) In order to preserve the trial court's discretion to determine hostility under Rule 238, the Rule should only be applied to witnesses who have already taken the stand and shown themselves hostile or uncooperative or unwilling. (See *Quagliano v. Johnson* (1968), 100 Ill. App. 2d 444, 450, 241 N.E.2d 187.) Assuming, however, that Patterson could have been found hostile for purposes of Rule 238 even prior to taking the stand, the Rule does not allow impeachment by prior inconsistent statement unless the hostile witness is an occurrence witness and the party calling him is surprised by his testimony. (See Ill. Rev. Stat. 1979, ch. 110A, par. 238; see also *Hall v. Baum Corp.* (1973), 12 Ill. App. 3d 755, 760, 299 N.E.2d 156.) In the case at bar, the prosecutor explicitly disavowed the element of surprise. Furthermore, Patterson was not an occurrence witness. (See *Yamada*, at 108.) We conclude that Supreme Court Rules 433 and 238 did not authorize Patterson's impeachment by prior inconsistent statement. See generally E. Cleary and M. Graham, Handbook of Illinois Evidence §607.4, at 267-68 (3d ed. 1979) (giving reasons why hostile witnesses are only subject to certain methods of impeachment).

The State argues that Patterson should have been examined as a court's witness. The court's witness doctrine developed in response to situations where a witness' testimony was crucial but neither the State nor the defense would vouch for the witness' credibility. (See *People v. Moriarity* (1966), 33 Ill. 2d 606, 615, 213 N.E.2d 516.) In order to prevent a miscarriage of justice (*i.e.*, the loss of testimony vital to the factfinder's search for truth), the court is permitted to call the witness and both parties can cross-examine. (See *Moriarity*, at 615; *People v. McKee* (1968), 39 Ill. 2d 265, 270, 235 N.E.2d 625.) The authorities are in agreement that the court's witness doctrine is to be employed sparingly, and only to prevent a miscarriage of justice. (See, *e.g.*, *McKee*, at 270; *Moriarity*, at 615; *People v. Pastorino* (1980), 90 Ill. App. 3d 921, 926, 414 N.E.2d 54, *appeal allowed* (1981), 84 Ill. 2d 21.) It is further required that the witness' testimony relate to the direct issue to be tried. (*Moriarity*, at 615.) Older cases required that the court's witness be an eyewitness to the crime charged,

but this rule has been relaxed in more recent cases. See *Moriarity*, at 615.

We are unable to see how the instant case meets the requirements set forth in *Moriarity*. At the threshold is the voucher issue: the State is unable to vouch for a witness' testimony only when the testimony is unknown. (See *Pastorino*, at 927.) If the State knows what a witness will relate, the State must either refrain from calling the witness or limit questions to the evidence the State desires to elicit. (*Pastorino*, at 927.) Assuming, however, that the State could fairly claim that Patterson's testimony was unexpected, the State is still unable to show that Patterson's testimony related to direct issues. The direct issue on trial was defendant's guilt or innocence of armed robbery, not whether a witness once *said* defendant was guilty of robbery. (See *People v. Grigsby* (1934), 357 Ill. 141, 148, 191 N.E. 264.) Giving the State the benefit of every doubt, then, we may assume that Patterson's testimony was unanticipated, that the State believed his testimony might bear directly on the issue of defendant's guilt, and that the loss of this testimony would be a miscarriage of justice. In this event, the issue is whether the State, having properly called a court's witness, can impeach the witness by means of a prior inconsistent statement when the witness' testimony fails to meet the State's expectations. A review of the authorities indicates that this question must be answered in the negative.

■■ It is well settled that prior statements of a witness are hearsay, inadmissible as substantive evidence. (See *People v. Spicer* (1979), 79 Ill. 2d 173, 179-80, 402 N.E.2d 169, *cert. denied* (1980), 446 U.S. 940, 64 L. Ed. 2d 794, 100 S. Ct. 2162; see also *People v. Gant* (1974), 58 Ill. 2d 178, 183, 317 N.E.2d 564; *People v. Collins* (1971), 49 Ill. 2d 179, 194, 274 N.E.2d 77; *People v. Paradise* (1964), 30 Ill. 2d 381, 384, 196 N.E.2d 689.) The rationale for this rule was stated in *People v. Collins*:

> "To give these statements substantive value would allow an accused to be convicted on extra-judicial statements of witnesses—a practice that runs counter to the notions of fairness on which our legal system is founded." (49 Ill. 2d 179, 194.)

Prior inconsistent statements of a witness are admissible only for impeachment purposes (see *Paradise*, at 384), and are so admissible only when the testimony to be impeached affirmatively damages the calling party's case. (See *Pastorino*, at 928; *People v. Triplett* (1980), 87 Ill. App. 3d 763, 767, 409 N.E.2d 401; *People v. Lipscomb* (1974), 19 Ill. App. 3d 114, 122, 311 N.E.2d 257; E. Cleary & M. Graham, Handbook of Illinois Evidence §607.4, at 270-71 (3d ed. 1979); McCormick, Evidence §36, at 71-72 (2d ed. 1972).) It is not enough that the witness' testimony disappoints the calling party; the testimony to be impeached must aid the opposing party. (*Pastorino*, at 928.) A noted commentator has explained the rationale for this rule:

> "[I]f a party interrogates a witness about a fact which would be

favorable to the examiner if true, and receives a reply which is merely negative in its effect on examiner's case, the examiner may not by extrinsic evidence prove that the first witness had earlier stated that the fact was true as desired by the inquirer. An affirmative answer would have been material and subject to be impeached by an inconsistent statement, but a negative answer is not damaging to the examiner, but merely disappointing, and may not be thus impeached. In this situation the policy involved is not the saving of time and confusion, as before, but the protection of the other party against the hearsay use by the jury of the previous statement." (McCormick, Evidence §36, at 71-72 (2d ed. 1972).)

As noted above, our supreme court has recently reaffirmed this State's adherence to the rule that extrajudicial statements of witnesses are hearsay. See *Spicer*, at 180; see also *Grigsby*, at 149 (outlining the dangers of trying a defendant by means of extrajudicial statements).

The State argues that the hearsay nature of Patterson's pretrial statement is irrelevant insofar as the statement was offered as impeachment and not for the truth of the matter asserted. However, the purpose of impeachment is to destroy credibility (*McKee*, at 270), and if Patterson has already been shown to be a witness for whom the State cannot vouch (the threshold requirement for a court's witness), the need for further attacks on his credibility is questionable. As our supreme court stated in *People v. Grigsby*:

> "If the witness admitted making the previous statement, it would prove nothing except that he, an admittedly unreliable witness, had said so. If the witness denied making the statement the matter would necessarily end there, because to pursue it further would be trying a collateral issue rather than a fact material under the indictment." 357 Ill. 141, 149.

The quoted passage from *Grigsby* demonstrates another reason for disallowing the impeachment of Patterson. As soon as Patterson denied that defendant had made an admission, it became clear that Patterson could offer no evidence on the direct issue in controversy, *i.e.*, defendant's guilt or innocence. (See *Grigsby*, at 148.) What Patterson may have *said* at the police station is a collateral matter, so Patterson's denial that he made the statement was conclusive and the State should not have been allowed to prove this collateral matter by extrinsic evidence of the statement. (See *People v. Johnson* (1929), 333 Ill. 469, 474-75, 165 N.E. 265.) At trial, Patterson said nothing tending to incriminate defendant. By impeaching Patterson, the State could show only that Patterson's neutral testimony was incredible. To permit the jury to infer guilt from the unreliability of inconclusive testimony is to convict a defendant by innuendo rather than direct evidence.

■■ The courts of this State have uniformly condemned the practice of bringing unsworn testimony before the jury under the guise of impeachment. (See, *e.g., Johnson,* at 475; *Pastorino,* at 927; *People v. Robinson* (1977), 46 Ill. App. 3d 713, 718, 361 N.E.2d 138; *People v. Chitwood* (1976), 36 Ill. App. 3d 1017, 1024, 344 N.E.2d 611; *People v. Dandridge* (1970), 120 Ill. App. 2d 209, 213, 256 N.E.2d 676.) The record in the instant case suggests that this was indeed the State's intent. In presenting his motion to have Patterson called as a court's witness, the prosecutor said:

> "Judge, I have a written statement that he signed which contains what took place. I would ask in the interest of justice, Judge, that I not have to call him and vouch for his credibility. That I call him as a court's witness and be allowed to call his attention to that statement. And, if necessary, to impeach him."

A recent opinion in this court has held that when the State puts on a witness, knowing his testimony will differ from a prior statement, the State's impeachment is in fact an offer of substantive evidence under the guise of impeachment. (*Pastorino,* at 927.) In light of the foregoing, we conclude that the impeachment of Patterson with his prior inconsistent statement was error.

The State relies on *People v. Larson* (1980), 82 Ill. App. 3d 129, 402 N.E.2d 723, arguing that it is "strikingly similar" to the case at bar. In *Larson,* the daughter of one of the defendants was called as a witness. Before a grand jury, the daughter had testified that she had helped the defendants gain admittance to the museum that was robbed. The State was allowed to call her as a court's witness, whereupon she denied that she had ever been to the museum, although she admitted that she had made such a statement to the grand jury. The *Larson* case is distinguishable from the present case because the State had reason to believe that the witness was an eyewitness to a portion of the crime. She therefore could have testified regarding a direct issue in the case. The appellate court in *Larson* held that the daughter was properly called as a court's witness. (82 Ill. App. 3d 129, 139.) The *Larson* court, however, did not address the propriety of the State's impeachment of the court's witness. Following the cases set out above, the daughter's prior statement to the grand jury was hearsay and should not have been used to impeach her when the State was disappointed by her testimony that she had never been to the museum. As the court in *Larson* failed to consider the impeachment issue, we decline to follow the result in that case.

■■ The next issue is whether the admission of Patterson's hearsay prior statement can be considered harmless error. Defendant contends that he was not proved guilty beyond a reasonable doubt, and that no error can be deemed harmless. A review of the evidence reveals that the admissible evidence of guilt was substantial: defendant was arrested in clothing

resembling that of the robber, and in possession of proceeds identified as those taken in the robbery. A trail of footprints linked the occupants of the basement apartment to the robber's car, which contained items used in the crime, and which car was registered to defendant. We have no hesitation in holding that this evidence is sufficient to support a conviction. On the other hand, there is a reasonable possibility that the erroneously admitted evidence (the pretrial and in-court identifications of defendant and Patterson's hearsay prior statement) contributed to the conviction. (See *Robinson*, at 718; see also *Chapman v. California* (1967), 386 U.S. 18, 23, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827; *Fahy v. Connecticut* (1963), 375 U.S. 85, 86-87, 11 L. Ed. 2d 171, 172-74, 84 S. Ct. 229, 230-31.) We also note that the errors were compounded when the prosecutor referred in closing argument to the inadmissible evidence. In particular, the State's rebuttal argument made repeated references to Patterson's statement, without reference to the fact that the statement was ostensibly offered for the limited purpose of impeachment. In light of all the circumstances, we hold that the errors were not harmless.

Accordingly, defendant's convictions are reversed and the cause is remanded for a new trial.

Reversed and remanded.

HARTMAN, P. J., and DOWNING, J., concur.